UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

PAMELA A. HART,                          :
      Plaintiff,                      :
                          :
       v.                              :     C.A. No. 15-515M
                          :
CAROLYN W. COLVIN, ACTING                :
COMMISSIONER OF SOCIAL SECURITY,         :
      Defendant.                      :

**REPORT AND RECOMMENDATION**

PATRICIA A. SULLIVAN, United States Magistrate Judge.

On October 12, 2012, Plaintiff Pamela Hart applied for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI") under §§ 405(g), 1631(c)(3) of the Social Security Act, 42 U.S.C. §§ 405(g), 1383(c)(3) (the "Act"), alleging that, since January 1, 2006, she had been unable to work because of psoriatic and rheumatoid arthritis, hip and spine pain, and anxiety and mood disorder. After she dropped her DIB application,[1] an Administrative Law Judge ("ALJ") issued a decision finding that neither her physical nor her mental impairments caused disabling limitations. In this Court, she has challenged only the ALJ's residual functional capacity ("RFC") finding with respect to her mental health impairments, arguing that he erred in his treatment of the opinions of the consulting psychologist and a treating physician and in his evaluation of Plaintiff's credibility. Before the Court is Plaintiff's motion for reversal of the decision of the Commissioner of Social Security (the "Commissioner"). Defendant Carolyn W. Colvin asks the Court to affirm the Commissioner's decision. These motions have been referred

---

[1] During the hearing, Plaintiff confirmed that her DIB application was withdrawn. Tr. 35. The Commissioner points out that Plaintiff's Title II claim is legally precluded because Plaintiff's prior Title II application was denied, the denial was not further appealed and Plaintiff was insured for disability benefits only through March 31, 2007. Tr. 111-13, 228.

to me for preliminary review, findings and recommended disposition pursuant to 28 U.S.C. § 636(b)(1)(B).  Having reviewed the entire record, I find that the ALJ committed no legal error and that his findings are well supported by substantial evidence; accordingly, I recommend that Plaintiff's Motion to Reverse the Decision of the Commissioner (ECF No. 10) be DENIED and Defendant's Motion for an Order Affirming the Decision of the Commissioner (ECF No. 12) be GRANTED.

I.      **Background**

        Plaintiff completed three years of college, after which she worked as a school custodian and a certified nurse assistant ("CNA") until stopping at the age of approximately thirty in 2000 following a work-related incident during which she hurt her back.  Tr. 36-37.  She initiated two unsuccessful SSI/DIB applications that were denied in 2002 and 2007 respectively.  Tr. 217, 228. In the current application, she alleges onset of disability as of January 1, 2006, based on an array of physical impairments, including rheumatoid arthritis, psoriatic arthritis, fibromyalgia, a bone condition in her spine and problems with her joints and hips.[2]  Tr. 57, 67.  She also alleges mental impairments, including anxiety, mood disorder, panic disorder and obsessive compulsive disorder.  Tr. 33.

        From 2004 through 2007, Plaintiff saw Dr. Marven Leftick for psoriasis and pain.  Tr. 307-89.  He prescribed narcotics, increasing in intensity from Percodan, to Percocet to OxyContin.  Tr. 340, 344, 349.  Over the course of treatment, Dr. Leftick became troubled by the inconsistency between the objective clinical signs and Plaintiff's subjective reports: "I find her situation perplexing.  Her complaints of pain are out of proportion to physical findings or test results."  Tr. 361.  By 2006, Dr. Leftick's notes reflect his concern about how to diminish the

_____

[2] While the medical record confirms treating diagnoses of psoriasis, psoriatic arthritis, and sclerosis consistent with sacroiliitis, as well as a question of ankylosing spondylitis, there does not appear to be a diagnosis of rheumatoid arthritis or fibromyalgia.

narcotics she was taking, particularly when he learned from a monitoring agency that she was getting opioids from other prescribers.  Tr. 374.  In August 2007, Dr. Leftick declined to continue to prescribe narcotics, noting that he had "patients with clearcut inflammatory joint disease who do not require medications of this nature on a continuing basis," and that "it is clear that she has a problem with drug issues."  Tr. 593.  He referred Plaintiff to another physician for pain management and ceased to provide her with any care.  Id.

From August 2007 through the end of 2011, what limited health care Plaintiff received appears to have been at the emergency rooms of Kent Hospital based on complaints of back and neck pain.  Tr. 483-514, 611-21.  These records reflect repeated x-rays, MRIs and CT scans almost all of which are either normal or reflect sclerosis, consistent with the diagnosis of sacroilliitis; each time, Plaintiff was sent home the same day, usually with a prescription for narcotic pain medication.

The next treating physician does not appear in the record until January 2012, when Plaintiff had an appointment with Dr. Okosun Edoro.  Tr. 528.  He advised her to go to a pain clinic because he would not prescribe narcotics.  Id.  However, when she persisted, he gave her the prescriptions she wanted for OxyContin and Percocet.  Tr. 529.  By late August 2012, he told her he would not prescribe narcotics for her again.  Tr. 533.  At her final appointment with him, in early October 2012, Plaintiff told Dr. Edoro she had finally made an appointment to set herself up with another doctor and that she was extremely stressed and anxious because she was being evicted and her narcotics had run out.  Tr. 538.  He relented and wrote one more prescription for both OxyContin and Percocet; she never saw him again.  Id.  The following day, October 5, 2012, she filed her SSI/DIB applications and initiated her first ever (as far as this record reveals)

mental health treatment with the Kent Center, where she had an intake appointment with a licensed social worker, Taneil Jennings.  Tr. 539.

Plaintiff's treating relationship with the Kent Center did not last long.  At intake, she told the social worker that her anger was caused by her primary care doctor's unwillingness to help her with "meds."  Tr. 540.  During her only counseling appointment, Plaintiff explained that her stress was caused by her need for pain medication, which her primary care physician had stopped prescribing because he "is no longer prescribing as he is now a holistic practitioner."[3]  Tr. 552. However, after a nurse practitioner from the Kent Center explained that, "[t]his office does not regularly prescribe Narcotics pain medications for long term management," Plaintiff seems to have returned for just one counseling appointment in November 2012 and then stopped treatment.  Tr. 554.  During what appears to be a total of three Kent Center appointments (with the social worker and the nurse practitioner), the notes reflect that Plaintiff was sad, anxious, helpless and tearful and that she claimed to have several obsessive behaviors (excess cleaning and counting letters in her head); she was provisionally diagnosed with adjustment disorder and assigned a Global Assessment of Functioning ("GAF") score of 38.[4]  Tr. 548-49.  However, the Kent Center social worker also completed a form to determine Plaintiff's eligibility for a more intensive level of treatment – this form reflects the opinion that Plaintiff has no "functional impairment which has substantially interfered with one or major life activities during the last 12

---

[3] There is no such suggestion in Dr. Edoro's records.

[4] The GAF scores relevant to this case are the 41-50 range, which indicates "serious impairment in social, occupational, or school functioning;" and the 31-40 range, which indicates "[s]ome impairment in reality testing or communication."  See Diagnostic and Statistical Manual of Mental Disorders, Text Revision 32–34 (4th ed. 2000) ("DSM–IV–TR").  In 2013, the DSM eliminated the GAF scale because of 'its conceptual lack of clarity . . . and questionable psychometrics in routine practice.'"  Santiago v. Comm'r of Soc. Sec., No. 1:13-CV-01216, 2014 WL 903115, at *5 n.6 (N.D. Ohio Mar. 7, 2014) (citing Diagnostic and Statistical Manual of Mental Disorders at 16 (5th ed. 2013) ("DSM-5")).

months or for a period of at least 6 months," as well as the opinion that Plaintiff's limitations in the areas of interpersonal relationships, role performance, socio-legal and self-care/basic needs were all slight.  Tr. 570.

At the end of 2012, Plaintiff returned to the Kent Hospital emergency room, claiming a pain flare from a motor vehicle accident several weeks before[5] and that she was being followed at Thundermist,[6] but had run out of narcotics and could not reach her physician.  Tr. 579.  In March 2013, she went to the Rhode Island Hospital emergency room claiming that she had fallen.  Tr. 596.  She was discharged the same day with a prescription for Percocet and ibuprofen.  Tr. 602, 605.

Also in March 2013, Plaintiff had an initial visit with Dr. James Schwartz of Coastal Medical Center, who noted that she previously had been on very high doses of OxyContin.  Tr. 708.  He ordered an MRI to follow up on the cause of the pain and recommended that she see a psychiatrist for depression.  Tr. 709.  A month later, based on an MRI that reflected no abnormal findings, Dr. Schwartz counselled Plaintiff about improving her diet, exercising and stopping cigarettes.  Tr. 714.  In reliance on her commitment to comply with his treatment recommendation, he agreed to prescribe Vicodin.  Id.  By the end of April, Dr. Schwartz had increased Plaintiff's pain medication to Percocet, but she continued to complain of severe pain; she said that Percocet was only minimally efficacious.  Tr. 718.  Dr. Schwartz found that her complaints presented a "difficult case" and prescribed Hydromorphone.  Id.  On May 3, 2013, with her SSI application mental health examination imminent, she asked Dr. Schwartz for a referral for unspecified symptoms of obsessive compulsive disorder; the record does not reflect that he made a referral.  Tr. 722.  On May 16, 2013, based on her complaint of a reaction to

---

[5] There is no mention of a motor vehicle accident in any other record.

[6] There is no other suggestion in the record that Plaintiff ever was treated at Thundermist.

Hydromorphone, he switched her back to Percocet and also noted that she was "severely depressed" based on his administration of the PHQ9 Tool.  Tr. 724.  Because she had never had a "decent trial of antidepressant medication," he prescribed Citalopram, which he switched to Venlafaxine in July 2013.  Tr. 724, 731

In May 30, 2013, Dr. Schwartz began to record his troubling observation that Plaintiff's "sighing and grunting apparently in pain" was inconsistent depending on who was observing her: "[h]er affect in the exam room is different than that observed as she was leaving the exam room and moving to the phlebotomy room . . . [i]n the latter situation she was not using body language to convey pain."  Tr. 727.  Based on these observations, Dr. Schwartz was "not convinced that Percocet was inadequate in treating her pain;" he declined to prescribe OxyContin, as Plaintiff was requesting, and advised her to wean off Percocet.  Id.  At his last appointment with her in July 2013, he made the same observations.  Tr. 731.  Six months later, in January 2014, another Coastal Medical Center physician, Dr. William Slade, had a new patient intake with Plaintiff. He administered the same depression screen used by Dr. Schwartz in May 2013.  This time instead of "severe" depression, the test showed that Plaintiff was "moderate[ly]" depressed.  Tr. 738.  Plaintiff told Dr. Slade that she "blew two disc[s] out in lower back and 2 in neck" in 2000,"[7] id.; he discussed the risks of opioid use but prescribed Percocet, Tr. 737.

During the six month gap between treating with Dr. Schwartz and treating with Dr. Slade, Plaintiff went to the South County Hospital urgent care center and was seen by the emergency room physician, Dr. Joseph Turner, a total of four times.  Tr. 622-707.  At the first appointment with Dr. Turner, in October 2013, Plaintiff complained of "neck sprain/strain."  Despite a normal

---

[7] At least for the time period reflected in the record, serious disc herniation appears to be contradicted by the x-rays and MRIs.  See, e.g., Tr. 291 (MRI of November 29, 2005, shows no disc issues); Tr. 489 (x-ray of January 9, 2012, shows normal cervical examination); Tr. 712 (MRI of March 6, 2013, shows no evidence of acute disc pathology in lumber spine; "very slight asymmetric disc bulge is present at L5-S1").

x-ray, Dr. Turner prescribed Oxycodone and a muscle relaxant.  Tr. 627, 629.  The second

appointment with Dr. Turner was on November 22, 2013.  In response to her complaint that she

had slipped and was experiencing sacroiliac pain, he renewed the Oxycodone prescription and

ordered x-rays and a body scan.  Tr. 641, 645.  This time, his note mentioned a history of

depression but his findings on mental status examination were all normal: "Neuro/Psych oriented

x3 . . . mood/affect nml."  Tr. 641-42.  At the third appointment, Dr. Turner reviewed the results

of the scan and x-ray he had ordered; while they showed the sclerosis detected on other studies,

there were no acute findings.  Tr. 654.  Dr. Turner again prescribed Oxycodone but this time he

referred Plaintiff to a rheumatologist.  Tr. 656.  Other than the ongoing note that she had a

history of depression, Dr. Turner's only mental health observations was "oriented x3."  Tr. 665.

At the last appointment, on December 16, 2013, Dr. Turner recorded that Plaintiff was in pain

and had not been able to establish a new primary care physician; he prescribed more Oxycodone.

Tr. 674.  He also noted normal mental status: "Neuro/Psych . . . oriented x 3, mood affect nml."

Tr. 698.  As far as the record reflects, she never saw him again.

## II.     Relevant Opinion Evidence

Plaintiff was referred for a consultative psychological examination with a psychologist,

Dr. Lori McKinsey, which was performed on May 16, 2013.  Tr. 584-88.  Plaintiff told Dr.

McKinsey that she was injured at work in 2000, resulting in two bulging discs[8] and a fractured

pelvis; she claimed to suffer from rheumatoid arthritis and fibromyalgia, diagnoses not reflected

in the record, in addition to psoriatic arthritis.  For mental health symptoms, she reported

constant panic attacks, "a couple a day[s] now," [9] for which she had been to the Kent Hospital

---

[8] But see n.7.

[9] According to the evidence in the medical record, Plaintiff never mentioned panic attacks to any treating provider.
The closest reference is social worker Taneil Jennings's note that "clt has begun to have severe anxiety w/panic."

emergency room five times in the past six months,[10] as well as depressed mood and diminished ability to concentrate. Tr. 584, 586. She denied obsessions except for issues with symmetry and alphabetizing words, which did not interfere with her functioning. Tr. 586. She confirmed that she was not taking any psychiatric medications or other mental health treatment; while she had had therapy at the Kent Center in September 2012 she discontinued after three months "as the counselor was not helpful and reportedly refused to refer her to a psychiatrist for medication."[11] Tr. 585.

On mental status examination, Dr. McKinsey found Plaintiff tearful and anxious, with coherent thought processes, average intellectual functioning, elevated motor affect, clear but rapid speech and appropriate answers, though she sometimes needed to be redirected to specific questions. Tr. 585-86. Testing resulted in the finding that Plaintiff's short-term memory was markedly impaired, her immediate memory appeared to be grossly intact and her concentration appeared to be mildly impaired. Tr. 587. Based on the clinical interview and test results, Dr. McKinsey diagnosed major depressive disorder and panic disorder without agoraphobia and assessed a GAF of 43;[12] in the "statement" portion of her report, she opined:

---

Tr. 539. However, there is no reference in the Kent Center record to panic attacks; moreover, social worker Jenning's provisional diagnosis was neither anxiety nor panic attacks, but rather adjustment disorder with mixed anxiety and depression. Tr. 548.

[10] The record contains almost two hundred pages of records from Kent Hospital, almost all from the emergency room. Tr. 253-306, 416-51, 452-82, 483-514, 515-27, 575-82, 611-21. None mentions panic attacks. The records within the six months preceding the appointment with Dr. McKinsey reflect a "pain flare" in connection with a motor vehicle accident, Tr. 577, low back pain, Tr. 615, and neck and back pain, Tr. 616. Except for Dr. Schwartz's mention of his diagnosis of depression and Plaintiff's request for a referral for obsessive compulsive disorder without reference to any specific symptoms, Tr. 718-26, there is no reference to any mental health concern in any of the treating records for the six month period prior to Dr. McKinsey's examination.

[11] The Kent Center did not refuse to prescribe medication for mental health treatment; Plaintiff was prescribed Prozac and Trazodone for depression while she was a patient at the Kent Center. Tr. 554. Rather, its records reflect only that it advised Plaintiff that it would "not regularly prescribe Narcotic pain medications for long term management." Id.

[12] See n.4 supra.

8

> Claimant does not appear to be capable of remembering and carrying out instructions in a timely manner.  She is unlikely able [sic] to maintain attention for extended periods of time (e.g., 2 hour segments).  She is unlikely able [sic] to maintain regular attendance and be punctual within customary tolerances.  Claimant would likely require special supervision to sustain an ordinary routine.  She would likely not be able to complete a normal workday and workweek without interruptions from psychologically-based symptoms and would not be able to perform at a consistent pace without an unreasonable number and length of rest periods.  Claimant's symptoms of anxiety and depression are clearly exacerbated by her medical conditions and the resulting limits with regard to completing tasks of every day life.

Tr. 587-88.

On June 3, 2013, during the reconsideration phase of the case,[13] SSA psychologist Dr. Jan Jacobson reviewed Plaintiff's records; for purposes of Step Two findings, he found that both affective and anxiety disorders were severe, but that they resulted in mild restriction of activities of daily living, moderate difficulties in maintaining social functioning and maintaining concentration, persistence or pace, and caused no episodes of decompensation of extended duration.  Tr. 102.  He opined that Plaintiff retained the mental capacity to understand and remember simple instructions, to sustain attention and pace sufficient for full time work with occasional absences/disruptions due to psychological symptoms and to relate adequately to coworkers and supervisors, though she could not deal directly with the public.  Tr. 105-07.  In support of these opinions, Dr. Jacobson noted that Plaintiff was able to provide daily care to her mother with dementia while her brother was at work.  Tr. 102.  In reliance on the record evidence establishing that Plaintiff gave reasons for her inability to access narcotic pain medications to Dr. McKinsey that conflicted with what she told a contemporaneous treating source, and on his own opinion that Dr. McKinsey's objective finding do not indicate marked limitations, as well as that other treating records reflect only slight mental impairment, Dr.

---

[13] The file was also reviewed at the initial phase by a psychologist who found that none of Plaintiff's mental impairments was severe.  Plaintiff does not challenge the ALJ's determination to afford this opinion little weight.  <u>See</u> Tr. 24.  It will not be discussed further.

Jacobson also concluded that Dr. McKinsey's "opinion is not consistent with overall evidence and is given little weight."  Id.  And, based on his review of the entire record as of June 2013, he opined that Plaintiff's claim of marked limitations was not credible.  Id.

The third relevant opinion was from Dr. Turner, the emergency room physician from South County Hospital who saw Plaintiff four times between October and December 2013. Three months later, and despite treatment limited to Plaintiff's physical symptoms, on March 14, 2014, Dr. Turner signed an opinion regarding Plaintiff's mental RFC limitations.  Tr. 743-44. His opinion acknowledges that he saw Plaintiff over a period of only two months, that it was only in an urgent care environment and that his efforts mainly consisted of attempting to define Plaintiff's medical issues, help her establish primary care and provide pain relief.  Tr. 744. Nevertheless, he found her moderately limited in her abilities to deal with instructions, respond to supervision and co-workers and perform simple tasks.  He further assessed her moderately severely limited in her abilities to respond to customary work pressures and perform complex, repetitive or varied tasks.  Tr. 743-44.

## III.    Issues Presented

Plaintiff contends that the ALJ erred in his evaluation of the opinions of the consulting psychologist, Dr. McKinsey, and the emergency room physician, Dr. Turner, and that he erred in his adverse evaluation of Plaintiff's credibility.

## IV.    Standard of Review

The Commissioner's findings of fact are conclusive if supported by substantial evidence. 42 U.S.C. § 405(g).  Substantial evidence is more than a scintilla – that is, the evidence must do more than merely create a suspicion of the existence of a fact, and must include such relevant evidence as a reasonable person would accept as adequate to support the conclusion.  Ortiz v.

Sec'y of Health & Human Servs., 955 F.2d 765, 769 (1st Cir. 1991) (per curiam); Rodriguez v. Sec'y of Health & Human Servs., 647 F.2d 218, 222 (1st Cir. 1981); Brown v. Apfel, 71 F. Supp. 2d 28, 30 (D.R.I. 1999). Once the Court concludes that the decision is supported by substantial evidence, the Commissioner must be affirmed, even if the Court would have reached a contrary result as finder of fact. Rodriguez Pagan v. Sec'y of Health & Human Servs., 819 F.2d 1, 3 (1st Cir. 1987); see also Barnes v. Sullivan, 932 F.2d 1356, 1358 (11th Cir. 1991); Lizotte v. Sec'y of Health & Human Servs., 654 F.2d 127, 128 (1st Cir. 1981).

The determination of substantiality is based upon an evaluation of the record as a whole. Brown, 71 F. Supp. 2d at 30; see also Frustaglia v. Sec'y of Health & Human Servs., 829 F.2d 192, 195 (1st Cir. 1987); Parker v. Bowen, 793 F.2d 1177, 1180 (11th Cir. 1986) (court also must consider evidence detracting from evidence on which Commissioner relied). Thus, the Court's role in reviewing the Commissioner's decision is limited. Brown, 71 F. Supp. 2d at 30. The Court does not reinterpret the evidence or otherwise substitute its own judgment for that of the Commissioner. Id. at 30-31 (citing Colon v. Sec'y of Health & Human Servs., 877 F.2d 148, 153 (1st Cir. 1989)). "[T]he resolution of conflicts in the evidence is for the Commissioner, not the courts." Id. at 31 (citing Richardson v. Perales, 402 U.S. 389, 399 (1971)). A claimant's complaints alone cannot provide a basis for entitlement when they are not supported by medical evidence. See Avery v. Sec'y of Health & Human Servs., 797 F.2d 19, 20-21 (1st Cir. 1986); 20 C.F.R. § 416.929(a).

The Court must reverse the ALJ's decision on plenary review, if the ALJ applies incorrect law, or if the ALJ fails to provide the Court with sufficient reasoning to determine that the law was applied properly. Nguyen v. Chater, 172 F.3d 31, 35 (1st Cir. 1999) (per curiam); accord Cornelius v. Sullivan, 936 F.2d 1143, 1145-46 (11th Cir. 1991). Remand is unnecessary

where all of the essential evidence was before the Appeals Council when it denied review, and the evidence establishes without any doubt that the claimant was disabled.  <u>Seavey v. Barnhart</u>, 276 F.3d 1, 11 (1st Cir. 2001) (citing <u>Mowery v. Heckler</u>, 771 F.2d 966, 973 (6th Cir. 1985)). The Court may remand a case to the Commissioner for a rehearing under Sentence Four of 42 U.S.C. § 405(g); under Sentence Six of 42 U.S.C. § 405(g); or under both sentences. <u>Jackson v. Chater</u>, 99 F.3d 1086, 1097-98 (11th Cir. 1996).

## V.      <u>Disability Determination</u>

The law defines disability as the inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months.  42 U.S.C. § 416(I); 20 C.F.R. § 416.905.  The impairment must be severe, making the claimant unable to do previous work, or any other substantial gainful activity which exists in the national economy.  42 U.S.C. § 423(d)(2); 20 C.F.R. §§ 416.905-911.

### A.      **Treating Physicians and Other Sources**

Substantial weight should be given to the opinion, diagnosis and medical evidence of a treating physician unless there are good reasons to do otherwise.  <u>See Rohrberg v. Apfel</u>, 26 F. Supp. 2d 303, 311 (D. Mass. 1998); 20 C.F.R. § 416.927(c).  If a treating physician's opinion on the nature and severity of a claimant's impairments is well-supported by medically acceptable clinical and laboratory diagnostic techniques, and is not inconsistent with the other substantial evidence in the record, the ALJ must give it controlling weight.  <u>Konuch v. Astrue</u>, No. 11-193L, 2012 WL 5032667, at *4-5 (D.R.I. Sept. 13, 2012); 20 C.F.R. § 416.927(c)(2).  The ALJ may discount a treating physician's opinion or report regarding an inability to work if it is unsupported by objective medical evidence or is wholly conclusory.  <u>See Keating v. Sec'y of</u>

Health & Human Servs., 848 F.2d 271, 275-76 (1st Cir. 1988). The ALJ's decision must

articulate the weight given, providing "good reasons" for the determination. See Sargent v.

Astrue, No. CA 11–220 ML, 2012 WL 5413132, at *7-8, 11-12 (D.R.I. Sept. 20, 2012) (where

ALJ failed to point to evidence to support weight accorded treating source opinion, court will not

speculate and try to glean from the record; remand so that ALJ can explicitly set forth findings).

Where a treating physician has merely made conclusory statements, the ALJ may afford

them such weight as is supported by clinical or laboratory findings and other consistent evidence

of a claimant's impairments. See Wheeler v. Heckler, 784 F.2d 1073, 1075 (11th Cir. 1986).

When a treating physician's opinion does not warrant controlling weight, the ALJ must

nevertheless weigh the medical opinion based on the (1) length of the treatment relationship and

the frequency of examination; (2) nature and extent of the treatment relationship; (3) medical

evidence supporting the opinion; (4) consistency with the record as a whole; (5) specialization in

the medical conditions at issue; and (6) other factors which tend to support or contradict the

opinion. 20 C.F.R § 416.927(c). However, a treating physician's opinion is generally entitled to

more weight than a consulting physician's opinion. See 20 C.F.R. § 416.927(c)(2).

The ALJ is required to review all of the medical findings and other evidence that support

a medical source's statement that a claimant is disabled. However, the ALJ is responsible for

making the ultimate determination about whether a claimant meets the statutory definition of

disability. 20 C.F.R. § 416.927(d). The ALJ is not required to give any special significance to

the status of a physician as treating or non-treating in weighing an opinion on whether the

claimant meets a listed impairment, a claimant's RFC, see 20 C.F.R. §§ 416.945-946, or the

application of vocational factors because that ultimate determination is the province of the

Commissioner.  20 C.F.R. § 416.927(d); see also Dudley v. Sec'y of Health & Human Servs.,

816 F.2d 792, 794 (1st Cir. 1987) (per curiam).

### B.      Making Credibility Determinations

Where an ALJ decides not to credit a claimant's testimony, the ALJ must articulate

specific and adequate reasons for doing so, or the record must be obvious as to the credibility

finding.  See Da Rosa v. Sec'y of Health & Human Servs., 803 F.2d 24, 26 (1st Cir. 1986);

Rohrberg, 26 F. Supp. 2d at 309-10.  A reviewing court will not disturb a clearly articulated

credibility finding with substantial supporting evidence in the record.  See Frustaglia, 829 F.2d at

195.  A lack of a sufficiently explicit credibility finding becomes a ground for remand when

credibility is critical to the outcome of the case.  See Smallwood v. Schweiker, 681 F.2d 1349,

1352 (11th Cir. 1982).  If proof of disability is based on subjective evidence and a credibility

determination is, therefore, critical to the decision, "the ALJ must either explicitly discredit such

testimony or the implication must be so clear as to amount to a specific credibility finding."

Foote v. Chater, 67 F.3d 1553, 1562 (11th Cir. 1995) (quoting Tieniber v. Heckler, 720 F.2d

1251, 1255 (11th Cir. 1983)).

## VI.   Analysis

### A.      Opinion Evidence

Plaintiff's challenge to the mental health-based limitations that the ALJ embedded in his

RFC finding is focused on the ALJ's determination to afford minimal weight to Dr. McKinsey's

consulting examination report and to Dr. Turner's RFC opinion, while affording great weight to

the opinions of the SSA file reviewing psychologist (Dr. Jacobson).  She contends that this is

error because it elevates a non-examining source above two examining sources, which she argues is contrary to 20 C.F.R. § 404.1527.[14]

According to his decision, the ALJ accorded the opinions in the McKinsey report "less weight" for two reasons.  First, the ALJ noted that Plaintiff was taking no medication at the time of the McKinsey examination and the treating record establishes that Plaintiff's depression improved after Dr. Schwartz prescribed psychiatric medication, which happened right after the examination.  Plaintiff argues that this is error because there is no reference to any improvement in anxiety.  Second, the ALJ, somewhat obliquely, noted that "Dr. McKinsey's examination occurred in the same timeframe that Dr. Schwartz raised concerns about inconsistent behavior regarding physical impairments."  Tr. 24.  Plaintiff contends that the ALJ's reference to Dr. Schwartz appears to reflect the ALJ's conclusion that Plaintiff exaggerated her impairments during her interview with Dr. McKinsey, just as she did during her appointments with Dr. Schwartz; Plaintiff contends this is error because it ignores Dr. McKinsey's presumed ability as a trained psychologist to detect deception.  Dr. McKinsey explicitly stated in her report that Plaintiff seemed to her to be a "grossly reliable informant."  Tr. 584.

Careful review of the ALJ's two articulated reasons establishes that there is no error.  Together, they are more than enough to constitute substantial evidence for the limited weight afforded to Dr. McKinsey's opinion.

First, the ALJ relied on the record evidence establishing that Plaintiff's depression improved with treatment after Dr. McKinsey saw her.  As Plaintiff concedes, this finding is well grounded in the treating record.  On the same day when the McKinsey examination was performed, Dr. Schwartz assessed "Severe Depression" using the PHQ9 tool; noting that she had

_____

[14] Plaintiff cites to 20 C.F.R. § 404.1527, which applies only to DIB applications.  The Court assumes Plaintiff intended to refer to 20 C.F.R. § 416.927.

"never had a decent trial of antidepressant medication," he prescribed Citalopram.  Tr. 724.  Two

months later, when Plaintiff said Citalopram was not helping, he switched to Venlafaxine.  Tr.

731.  On January 13, 2014, Plaintiff transferred to Dr. Slade, who repeated the depression

assessment using the same tool; it shows that after seven months of medication, Plaintiff had

improved from severe to moderate.  Tr. 737-38.  Plaintiff's argument to rebut the sufficiency of

this reason focuses on the absence of any improvement in Plaintiff's level of anxiety.  This

criticism is unavailing – Dr. McKinsey's diagnosis was only for panic attacks, a symptom tainted

by the untrue information provided by Plaintiff about a supposed history of serious panic attacks.

She did not otherwise diagnose anxiety.  There is no error in the ALJ's reliance on the reason

that Dr. McKinsey's report overstated Plaintiff's mental health symptoms because she wrote it

before minimal treatment resulted in measurable improvement.

 The ALJ's other stated reason – that Dr. Schwartz was concerned about inconsistent

behavior regarding physical symptoms during the same time frame – is certainly not expressed as

clearly as it might be.  Nevertheless, Plaintiff concedes that the ALJ was trying to say that she

had exaggerated her impairments during her interview with Dr. McKinsey, just as she did during

her appointments with Dr. Schwartz.  Accepting Plaintiff's interpretation, I find this reason for

discounting Dr. McKinsey's opinion is well founded.  The Court's comparison of her statements

in the clinical interview with the evidence in the medical record confirms that there is no error in

the ALJ's conclusion that Dr. McKinsey failed to detect that she was being provided an

exaggerated description of mental health symptoms, just as it took Dr. Schwartz several months

of treating appointments before he detected the exaggeration of physical pain.  See Tr. 708-27

(from March until May 2013, Dr. Schwartz accepted complaints of extreme pain and prescribed

narcotics, until, with Plaintiff "requesting OxyContin," he observed changes in pain-related

behaviors when observed and not observed).  The fallacy of Plaintiff's only argument against the

sufficiency of this reason – that everything accepted as true by a trained psychologist must be

true – is exposed by Dr. McKinsey's unquestioning reliance on false information.

      In addition to the ALJ's well-supported reasons for affording Dr. McKinsey's opinion

little weight, the Court's review of the record has revealed that there are at least two other

reasons.[15]  Most significant is the number of false statements (all undetected by Dr. McKinsey)

that Plaintiff made during the clinical interview.  To highlight just one example, Dr. McKinsey

diagnosed panic attacks based on Plaintiff's statement that she was experiencing them daily and

that they caused five trips to the emergency room in six months.  Tr. 586.  Not only is the

balance of the record silent on this serious symptom, but the Kent Hospital records are available

so that the Court can readily confirm that this statement to Dr. McKinsey is simply untrue.

Another reason to steeply discount Dr. McKinley's report that was not mentioned by the ALJ is

the expert analysis of the report by SSA reviewing psychologist Dr. Jacobson.  Dr. Jacobson

reviewed the entire file, including Dr. McKinsey's report, and supplied his learned interpretation

of her objective observations and test results: "the Consultative Exam objective findings do not

indicate marked mental limitations."  Tr. 102.  With a clinical interview that was unreliable

because it was loaded with inaccurate information and with objective findings that a qualified

expert opined do not support the opinions, nothing is left to buttress Dr. McKinsey's extreme

conclusions.  Accordingly, to the extent that this Court were to conclude that the ALJ's stated

reasons for discounting Dr. McKinsey's opinion are legally insufficient, such an error is

---

[15] The operative regulation is far from plain that the opinion of a one-time consultative examiner, which is not entitled to controlling weight, see 20 C.F.R. § 416.927(c)(2), is subject to the mandate that an adjudicator must articulate reasons for the weight afforded to the opinions of treating sources.  See White v. Colvin, No. CA 14-171 S, 2015 WL 5012614, at *12 (D.R.I. Aug. 21, 2015) (whether or not one-time consultative examination report was "evaluated" by ALJ, ALJ did not commit reversible error in the treatment of it in his decision; remand not warranted for ALJ to repeat same findings based on report).  Thus, in reviewing the ALJ's treatment of Dr. McKinsey's report, the Court is not constrained by whether the ALJ's stated reasons alone are enough.

harmless because a remand for the ALJ to make a more complete statement of reasons would be a futile exercise. See Greenlief v. Colvin, No. CA 14-376, 2015 WL 4663593, at *10 (D.R.I. Aug. 6, 2015) ("The fact that the ALJ did not separately list each component of the opinion does not compel the interpretation that he did not evaluate it in its entirety.") (citing Rodriguez v. Sec'y. of Health & Human Servs., 915 F.2d 1557, at *1 (1st Cir. 1990) (per curiam) ("An ALJ is not required to expressly refer to each document in the record, piece-by-piece.")); Fisher v. Bowen, 869 F.2d 1055, 1057 (7th Cir. 1989) ("No principle of administrative law or common sense requires [a court] to remand a case in quest of a perfect [ALJ] opinion unless there is reason to believe that the remand might lead to a different result.").

The only other opinion supporting Plaintiff's claim of disabling mental impairments is the deeply flawed Turner RFC response. Tr. 743-44. The ALJ accorded Dr. Turner's RFC "little weight" because, as Dr. Turner himself commented on his own opinion, the treating relationship lasted only two months and was entirely in "an urgent care environment." Tr. 744. The ALJ also relied on the three-month delay between Dr. Turner's last appointment and the writing of the opinion. Tr. 24. Most significantly, the ALJ considered the complete absence in Dr. Turner's treating records of "any comprehensive mental status examination findings." Tr. 24. While the former reasons are certainly substantial, particularly in light of Dr. Turner's own caution on the limited nature of the treating relationship and his lack of mental health expertise, see 20 C.F.R. § 416.927(c)(2)(i), (ii), (c)(5), the last of the three reasons – the lack of objective medical evidence to support the opinion – is independently sufficient to render Dr. Turner's opinion one that must be discounted.

The analysis begins with the proposition that a treating physician's opinion may be discounted if it is unsupported by objective medical evidence. Keating, 848 F.2d at 275-76; 20

C.F.R. § 416.927(c)(3) ("[t]he more a medical source presents relevant evidence to support an opinion, particularly medical signs and laboratory findings, the more weight we will give that opinion").  Dr. Turner's treating records are clear that he was asked to address only physical symptoms, including neck strain, Tr. 622, sacroiliac joint pain, Tr. 632, acute low back pain, Tr. 656, rib pain and dysphyagia, Tr. 686.  Even more significant, not only are there no comprehensive mental status evaluations, as the ALJ noted, Dr. Turner did make limited observations of Plaintiff's mental status – and all such references record the complete absence of mental health symptoms.  See, e.g., Tr. 641-42 (November 22, 2013, note: "mood/affect nml"); Tr. 643 (November 22, 2013, note – "all systems negative except as marked," with no mark for "anxiety depression"); Tr. 698 (December 16, 2013, "Neuro/Psych oriented x3; mood/affect nml").  In short, Dr. Turner had no objective medical evidence to support his opinions and the limited objective information he did gather does not support them.  There is no error in the ALJ's adverse treatment of his opinion.

Because I find no material error tainting the weight afforded by the ALJ to the McKinsey report and to the Turner opinion, there is also no error in the weight afforded to Dr. Jacobson's opinions. See Bowden v. Astrue, Civ. No. 11-084, 2012 WL 1999469, at *4-5 (D.R.I. Jun. 4, 2012) (ALJ may rely on non-examining opinion that is not conclusory and explains the basis for medical conclusions reached).  Accordingly, I recommend that Plaintiff's motion to remand on this ground should be denied.

### B.     Credibility

There is no need to linger long over the ALJ's well-supported reasons for his finding that Plaintiff's statements concerning her limitations were "not entirely credible." Tr. 23.  To begin with, the ALJ properly relied on the many record references by various treating sources to her

exaggeration of her symptoms.  See Tr. 361 (Dr. Leftick observes that "[h]er complaints of pain

out of proportion to the physical findings or test results"); Tr. 727-32 (Dr. Schwartz observes that

sighing and grunting from pain occurs only when Plaintiff observed).  In addition to this

powerfully persuasive reason, the ALJ also properly relied on the findings that Plaintiff's "poor

employment record during this period suggests that other factors contribute to the claimant's

current lack of a job," Portorreal v. Astrue, Civ. No. 07-296, 2008 WL 4681636, at *10 (D.R.I.

Oct. 21, 2008) (ALJ may justifiably consider a claimant's poor work history as one factor

supportive of a negative credibility finding); that Plaintiff had a history of non-compliance with

treatment, SSR 96-7p, 1996 WL 374186, at *7 (non-compliance with prescribed treatment

renders statements less credible); and that Plaintiff's daily activities were "consistent with work

at the light exertional level," Rankin v. Colvin, 8 F. Supp. 3d 84, 92 (D.R.I. Mar. 28, 2014) (ALJ

may consider activities such as driving, shopping, and fulfilling parental duties in discounting

credibility).  Tr. 23.

       To rebut the ALJ's reliance on her noncompliance with treatment, Plaintiff counters that

the ALJ should have asked Plaintiff why she "failed to pursue other pain specialists" or why she

failed to pursue counseling.  This argument does not work.  With respect to counseling, the ALJ

did consider Plaintiff's explanation that she found counseling not helpful.  Tr. 23.  With respect

to Plaintiff's lack of compliance with pain treatment other than narcotic medication, the ALJ

accurately noted the apparent link, well supported in the record, between noncompliance and

opioid dependence.  See, e.g.,Tr. 385 (Plaintiff leaves practice after Dr. Leftick recommends pain

management in light of discrepancy between her complaints of pain and relatively benign

physical findings; he notes "addictive personality"); Tr. 533 (Plaintiff fails to follow up after Dr.

Edoro "advised patient that she should get another physician for pain management.  I will

prescribe the narcotics today but this would be the last."); Tr. 731 (treating relationship ends after Dr. Schwartz observed inconsistent pain behaviors and advised Plaintiff of "my insistence that Percocet is not for long term use and that she now needs to wean from it").  There is no error in the ALJ's reliance on this evidence.  See SSR 96-7p, 1996 WL 374186, at *7.  Nor was the ALJ obliged to ask Plaintiff for her explanation of this evidence; the responsibility rests on the claimant to provide whatever explanation may be pertinent.  Recission of Acquiescence Ruling 00-4(2), 68 Fed. Reg. 51317-01, 2003 WL 22001984 (Aug. 26, 200) ("[W]e do not have the burden to prove what your residual functional capacity is.").

Plaintiff's critique of the ALJ's reliance on her activities of daily living as inconsistent with her statements is also fruitless.  After failing to provide a function report, Plaintiff testified that she could cook, wash dishes, do laundry, sweep, vacuum, mop, shop for groceries, clean the bathroom, use a home computer and help her daughter with her homework.  Tr. 43-46.  She told Dr. McKinsey that, every day, she went to her mother's home, who suffers from dementia, to care for her while her brother was working.  Tr. 586-87.  There is no error in the ALJ's finding that these activities undermine the reliability of her complaints of disabling symptoms and limitations.  Matteson v. Colvin, Civ. No. 13-698, 2014 WL 4956230, at *13 (D.R.I. October 01, 2014) (ALJ properly considered claimant's activities of cooking, laundry, shopping, visiting with his parents and being a "house dad" to his children in finding his subjective complaints not fully credible).

There is no need to go further.  The ALJ's credibility finding is well supported by ample evidence.  I do not recommend remand to review it further.

**VII.   Conclusion**

Based on the foregoing analysis, I recommend that Plaintiff's Motion to Reverse the Decision of the Commissioner (ECF No. 10) be DENIED and Defendant's Motion for an Order Affirming the Decision of the Commissioner (ECF No. 12) be GRANTED.

Any objection to this report and recommendation must be specific and must be served and filed with the Clerk of the Court within fourteen (14) days after its service on the objecting party.  See Fed. R. Civ. P. 72(b)(2); DRI LR Cv 72(d).  Failure to file specific objections in a timely manner constitutes waiver of the right to review by the district judge and the right to appeal the Court's decision.  See United States v. Lugo Guerrero, 524 F.3d 5, 14 (1st Cir. 2008); Park Motor Mart, Inc. v. Ford Motor Co., 616 F.2d 603, 605 (1st Cir. 1980).

/s/ Patricia A. Sullivan
PATRICIA A. SULLIVAN
United States Magistrate Judge
December 1, 2016